UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

DANDONG OLD NORTH-EAST
AGRICULTURE & ANIMAL HUSBANDRY
CO., LTD. (f/k/a DANDONG PASITE
GRAIN AND OIL CO., LTD.),

          Plaintiff,

          v.

GARY MING HU, YUHUA WANG
ESTHER HU MANGAN, JOHN DOES 1 to
10, and JANE DOES 11 to 20,

          Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   August 3, 2017

15 Civ. 10015 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Dandong Old North-East Agriculture & Animal Husbandry Co.,

Ltd. ("Plaintiff" or "Dandong") alleges claims under the federal Racketeer

Influenced and Corrupt Organizations Act (commonly known as "RICO") and

New York law against its former executive, Gary Ming Hu, and others.  In brief,

Plaintiff contends that Hu conspired with individuals and entities to defraud

Plaintiff into paying above-market prices for tons of soybeans, and then

laundered proceeds of that fraud through New York real estate purchases

involving his ex-wife, Yuhua Wang, and their daughter, Esther Hu Mangan.

      Plaintiff filed its initial complaint on December 23, 2015.  After settling

with several defendants named in that document, Plaintiff filed an Amended

Complaint on November 28, 2016, naming only Hu, Wang, and Mangan as

defendants. At present, Hu is incarcerated in China and has not appeared in this action.

Before the Court is the joint motion of Wang and Mangan (collectively, "Defendants") to dismiss the claims asserted against them. Both Defendants move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and Mangan also moves to dismiss for want of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). As set forth in the remainder of this Opinion, the Court finds that although personal jurisdiction properly lies over both defendants, Plaintiff fails to state a claim under 18 U.S.C. § 1962(d), because it does not properly allege that Defendants' conduct caused a domestic injury to its business. And because the Court dismisses the federal-law claim over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over any related state-law claims. Accordingly, Defendants' motion to dismiss is granted in full.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Parties

Plaintiff is one of the largest purchasers of soybeans produced in the United States. (Am. Compl. ¶¶ 5, 22). The company is incorporated in China

---

[1]   This Opinion draws on facts from the Amended Complaint ("Am. Compl." (Dkt. #73)). *See, e.g.*, *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing documents that may be considered in Rule 12(b)(6) context). For ease of reference, the Court refers to Defendants' memorandum in support of their motion to dismiss as "Def. Br." (Dkt. #78), to Defendant Esther Hu Mangan's declaration in support of Defendants' motion to dismiss as "Mangan Decl." (Dkt. #80), to Plaintiff's response as "Pl. Opp." (Dkt. #88-90), and to Defendants' reply memorandum as "Def. Reply" (Dkt. #94).

and maintains a principal place of business in Dandong City, China. (*Id.* at ¶ 5). There, Plaintiff maintains an enormous factory that manufactures soybean oil and meal for distribution to consumers. (*Id.* at ¶ 23). Plaintiff relies on the receipt of a specific volume of soybean shipments from its suppliers (which are located principally in the United States and Brazil) to process approximately 5,600 metric tons of soybeans per day. (*Id.* at ¶¶ 23, 36).

Defendant Gary Ming Hu served as Plaintiff's Executive Director and General Manager from 2008 until 2010. (Am. Compl. ¶¶ 37, 83 n.2). A citizen of the United States, Hu maintained a residence in New York during the time he worked for Plaintiff. (*Id.* at ¶ 7). But since September 2013, Hu has been incarcerated in China following convictions stemming from the same events underlying this action. (*Id.*). Hu was initially convicted of diverting funds from Plaintiff's expense accounts during his time of employment. (*Id.*). His sentence was recently increased to twenty years after a subsequent conviction for perjury and making "materially false statements" to conceal his activities to defraud Plaintiff. (*Id.* at ¶¶ 68, 93).

Defendant Yuhua Wang is Hu's former wife. (Am. Compl. ¶ 9). According to Plaintiff, she is a current resident and domiciliary of Flushing, New York. (*Id.*). Defendant Esther Hu Mangan is their daughter. (*Id.* at ¶¶ 9-10). Mangan is a United States citizen who is domiciled in Seattle, Washington. (*Id.* at ¶ 10). Plaintiff believes that Hu, with help from Wang, Mangan, and other players in the soybean industry, conspired to divert funds

received from soybean contracts between Plaintiff and various United States suppliers as described further in this section.  (*Id.* at ¶¶ 9-10).

### 2.    Standard Practices in the Soybean Industry

As background, Plaintiff explains that there are common practices in the soybean industry to which buyers and sellers adhere when negotiating contracts.  (Am. Compl. ¶ 25).  Because soybean prices frequently fluctuate, buyers settle on a list of alternative prices per soybean bushel either with brokers, or with sellers who contract on behalf of the soybean suppliers.  (*Id.* at ¶ 35).  These alternative prices anticipate changes in soybean prices during the purchase and shipment periods.  (*Id.* at ¶ 27).  The buyer then selects a final purchase price by the "pricing cutoff date," which typically occurs before the soybeans arrive by vessel at the buyer's port.  (*Id.* at ¶ 29).  Finally, buyer and broker open an irrevocable letter of credit, which is provided before the soybeans are shipped.  (*Id.* at ¶ 32).  According to Plaintiff, the letter of credit favors the seller because it represents a value that covers "price fluctuations while the shipment is in transit."  (*Id.*).  A buyer defaults on the contract by failing to provide a letter of credit, but once the letter is provided, it "nearly always result[s] in a credit owed to the buyer at the close of the transaction." (*Id.*).

### 3.    Hu's Alleged Fraud

Plaintiff hired Hu as an Executive Director and General Manager on August 26, 2008.  (Am. Compl. ¶ 35).  Acting as an agent on Plaintiff's behalf, Hu had sole authority to negotiate contracts with brokers in the United States

and Brazil. (*Id.*). Plaintiff expected Hu to analyze market trends and "obtain the best available price for the shipment of soybeans" under the alternative pricing lists set forth in each contract. (*Id.* at ¶¶ 35, 40, 42). But instead of meeting these expectations, Hu conspired with Wang, Mangan, and various soybean brokers to steal company funds. (*Id.* at ¶ 48).

According to Plaintiff, between April 2009 and December 2010, Hu "manipulate[d] contracts and pricing" to overcharge Plaintiff. (Am. Compl. ¶ 43). In particular, Hu entered into twenty-three contracts on Plaintiff's behalf where the price of soybeans was significantly inflated. (*Id.* at ¶¶ 41, 42). By inflating the contract prices, Hu forced Plaintiff to pay more "than it actually should have based on current commodity prices." (*Id.* at ¶ 43). In theory, these overpayments would have entitled Plaintiff to refunds "for the difference between the [letter of credit] and the final price." (*Id.*). But Hu concealed the refunds by sending Plaintiff documents that reflected "incorrect — and higher — prices" above the soybeans' market value. (*Id.* at ¶ 57). The scheme resulted in losses to Plaintiff exceeding $10.877 million. (*Id.* at ¶ 44).

Worse yet, Hu was also secretly "working for, and being paid by at least one soybean broker (seller) on the same contracts he was ostensibly negotiating for the benefit of [Plaintiff]." (Am. Compl. ¶ 49). Hu "took affirmative steps to conceal" this dual employment, and in so doing reaped two salaries in addition to the "fraudulently-obtained profit" from his contract-inflation scheme. (*Id.* at ¶¶ 40, 57(c)).

### 4. The Role of Hu's Co-Conspirators

While Plaintiff overpaid on each contract, Hu took the overages and "wrongfully caused those refunds to be sent to parties other than Plaintiff." (Am. Compl. ¶ 44). According to Plaintiff, Hu transmitted the proceeds to others "by interstate and/or international wire" to bank accounts in China, Hong Kong, and New York. (*Id.* at ¶¶ 45-46). Plaintiff believes that Hu continued to transmit funds even after his abrupt resignation from Plaintiff's company in December 2010. (*Id.* at ¶¶ 41, 83 n.2).

Wang and Mangan helped Hu to conceal his fraudulent conduct. (Am. Compl. ¶ 100). Between 2010 and 2013, Hu wire-transferred proceeds from the fraudulent scheme to Wang's and Mangan's New York bank accounts. (*Id.* at ¶¶ 74, 82). The two women then took steps to "hide the unlawful proceeds" in real estate investments. (*Id.* at ¶¶ 175-77). In particular, Wang and Mangan used $674,000 of the proceeds to purchase two condominiums in Flushing, New York. (*Id.* at ¶ 101).

### 5. Plaintiff's Damages from the Alleged Fraud

Plaintiff claims that in the niche soybean market, the viability of a soybean buyer's business depends on its reputation as an honest negotiator. (Am. Compl. ¶ 24). And because the soybean industry has limited sources of supply, a buyer with poor credibility will lose substantial business by being unable to contract with sellers at a competitive price. (*Id.*).

After Hu's resignation, Plaintiff undertook investigations that revealed just how extensively Hu's schemes had damaged the company. (Am. Compl.

¶¶ 97, 110).  These damages are outlined in the Amended Complaint.  First,

Plaintiff sustained monetary losses on each of the twenty-three contracts that

Hu allegedly overpriced.  (*Id.* at ¶ 120).  These losses comprised the price

difference between the amount that Plaintiff paid and the actual market value

of the soybeans, extra customs fees, and increased costs associated with

insurance and letters of credit.  (*Id.*).

Additionally, Hu's actions damaged Plaintiff's business reputation.  (Am.

Compl. ¶ 113).  Several news sources in the United States published articles

about Hu's fraudulent scheme and subsequent conviction.  (*Id.* at ¶ 118).

These articles, in turn, prompted suppliers to cut ties with Plaintiff.  (*Id.* at

¶ 114).  One sales representative specifically advised Plaintiff of its belief that

Plaintiff "did not honor contracts and had [business] trouble" because of its

association with Hu.  (*Id.*).  Indeed, Plaintiff lost its main soybean supplier in

the United States as a result of its damaged reputation.  (*Id.* at ¶ 111).

Ultimately, Plaintiff was forced to slow its business operations at its

factory in China.  (Am. Compl. ¶ 122).  As a consequence of losing its main

supplier, Plaintiff reduced the rate at which it processed soybeans and

terminated approximately ninety employees.  (*Id.*).  This reduction in business

operations then caused Plaintiff to lose much of its market share of the

soybean oil and meal it manufactured.  (*Id.* at ¶ 123).

## B.    Procedural Background

Plaintiff filed the initial complaint in this action on December 23, 2015.

(Dkt. #1).  After settling with certain of Hu's alleged co-conspirators, Plaintiff

filed its Amended Complaint on November 28, 2016.  (Dkt. #73).  The Court

held a conference to discuss the motion to dismiss proposed by Defendants

Wang and Mangan on December 6, 2016.  (Dkt. #74).  Wang and Mangan

subsequently filed their motion to dismiss the Amended Complaint on

December 21, 2016.  (Dkt. #78).  Plaintiff opposed the motion on March 1,

2017 (Dkt. #88-90), and briefing concluded when Wang and Mangan filed a

reply memorandum in support of their motion to dismiss on March 24, 2017

(Dkt. #94).

## DISCUSSION

### A.    Personal Jurisdiction Is Properly Exercised Over Defendant Mangan

#### 1.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(2)

Before addressing Defendants' motion to dismiss under Rule 12(b)(6), the

Court considers Defendant Mangan's antecedent motion to dismiss for lack of

personal jurisdiction under Rule 12(b)(2).  In this setting, "the plaintiff bears

the burden of establishing that the court has jurisdiction over the defendant."

*Elsevier, Inc.* v. *Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) ("*Elsevier

I*") (internal quotation marks omitted) (citing *DiStefano* v. *Carozzi N. Am., Inc.*,

286 F.3d 81, 84 (2d Cir. 2001)).  Prior to discovery, a plaintiff can establish

that the court has jurisdiction over a defendant by "pleading in good faith,

legally sufficient allegations of jurisdiction."  *Id.* (internal quotation marks

omitted) (citing *Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84

(2d Cir. 2013)); *see also AmTrust Fin. Servs., Inc.* v. *Lacchini*, No. 16 Civ. 2575

(PAE), 2017 WL 728262, at *6 (S.D.N.Y. Feb. 23, 2017) (citing *In re Terrorist*

*Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists.")).

A plaintiff makes sufficient allegations of jurisdiction by introducing "affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction." *AmTrust*, 2017 WL 728262, at *6 (internal quotation marks omitted) (quoting *S. New Eng. Telephone Co.* v. *Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 1993)). All jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *Elsevier I*, 77 F. Supp. 3d at 341 (internal quotation marks omitted) (quoting *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)). But even this solicitude does not permit a court to "draw argumentative inferences," or to accept a conclusory statement "couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (internal quotation marks and citations omitted).

Federal courts engage in a two-step analysis to determine whether the exercise of personal jurisdiction is proper. *AmTrust*, 2017 WL 728262, at *6. First, a court must determine whether it has a statutory basis for exercising personal jurisdiction. *In re Braskem S.A. Sec. Litig.*, — F. Supp. 3d —, No. 15 Civ. 5132 (PAE), 2017 WL 1216592, at *23 (S.D.N.Y. Mar. 30, 2017) (internal quotation marks omitted) (quoting *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 129 (2d Cir. 2013)). It does so by looking to Federal Rule of Civil Procedure 4 "unless a federal statute specifically provide[s] for national service

of process." *Id.* (quoting *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). If a federal statute does not provide for national service of process, a court may still exercise jurisdiction if, under Federal Rule of Civil Procedure 4(k)(1)(A), the defendant is subject to the jurisdiction in the state where the district court is located. *See* Fed. R. Civ. P. 4(k)(1)(A). Second, a federal court must consider whether its exercise of personal jurisdiction comports with due process. *Hecklerco, LLC* v. *YuuZoo Corp. Ltd.*, No. 15 Civ. 5779 (VM), 2017 WL 2294606, at *5 (S.D.N.Y. May 11, 2017) (citing *Licci ex rel. Licci* v. *Lebanese Can. Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)).

### 2.  Summary of the Parties' Arguments

Defendant Mangan first argues that the Court cannot exercise general jurisdiction because she is domiciled in Seattle, Washington. (Def. Br. 9). And while acknowledging that she owns property in New York, Mangan disclaims personal jurisdiction on that basis by maintaining that Plaintiff's causes of action do not arise from this ownership. (*Id.*). Separately, Mangan contends that this Court's exercise of personal jurisdiction over her would violate due process by requiring her to defend a lawsuit in a federal district court "more than 2[,]800 miles from her home." (*Id.*).

By contrast, Plaintiff argues that personal jurisdiction over Mangan is proper because RICO authorizes nationwide jurisdiction over out-of-district defendants, so long as the Court is authorized to hear a claim against at least one defendant in the action (here, Hu or Wang). (Pl. Opp. 22 (citing *PT United Can Co.* v. *Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998))). Even apart

10

from RICO, Plaintiff argues that Mangan satisfies the statutory and constitutional requirements for personal jurisdiction in New York State. (*Id.* at 23-24).

### 3. Analysis

This Court agrees with Plaintiff that it may properly exercise jurisdiction over Mangan on several bases. First, the Court finds that personal jurisdiction exists over Mangan by operation of the RICO statute, because the Court has personal jurisdiction over Defendant Wang, if not Defendant Hu, and because "the ends of justice require that other parties residing in any other district [here, Mangan] be brought before the court." 18 U.S.C. § 1965. Second, Plaintiff has made a *prima facie* showing that Mangan's alleged conduct in New York State satisfies the "transacting business" requirement under New York's long-arm statute. Finally, exercising personal jurisdiction over Mangan would not violate due process because (i) Mangan has sufficient contacts with New York State; and (ii) it would be reasonable for Mangan to defend herself in the state where she acted to further the alleged scheme.

### a. Jurisdiction Under 18 U.S.C. § 1965

In her opening brief, Defendant Mangan argues that a district court in New York cannot properly exercise general jurisdiction over her because she is not a resident. (Def. Br. 9; Mangan Decl. ¶ 2). It is true that for an individual defendant, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 760 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 923

(2011)). However, Mangan overlooks the nationwide service of process provision in the RICO statute, which provision states in relevant part:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b).[2]

In practice, courts have allowed this provision to be triggered only after a finding that a court has proper jurisdiction over at least one defendant under § 1965(a), which permits the institution of a civil RICO action "against any person ... for any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a); *see generally PT United Can Co.*, 138 F.3d at 71; *see also Lipson* v. *Birch*, 46 F. Supp. 3d 206, 216 (E.D.N.Y. 2014) ("Therefore, only in cases where at least one RICO defendant 'resides, is found, has an agent, or transacts his affairs' in the district in which the court is located, 18 U.S.C. § 1965(a), can nationwide service of process be effected with respect to the other RICO defendants — and then only if the 'ends of justice' require it."); *Daly* v. *Castro Llanes*, 30 F. Supp. 2d 407, 413 (S.D.N.Y.

---

[2] In Defendants' reply brief (*see* Def. Reply 7), Mangan attempts to correct this oversight, by noting the practical difficulties in serving Hu. She and Wang jointly note that they "will face difficulties defending this case so long as Hu remains unserved." (*Id.*). Indeed, Defendants go so far as to argue that "[i]f Hu were never served and were ultimately dismissed, the Complaint would state causes of action solely for conspiracy, the substantive RICO claims being alleged solely against Hu. Such a complaint would fail to state a claim." (*Id.*). The Court is not prepared to follow Defendants' logic, which the Court notes is tangential to the actual issue of the application of § 1965(b) on the record currently before the Court.

1998) ("The phrase 'ends of justice require' has been interpreted to mean that § 1965(b) authorizes an assertion of personal jurisdiction if, otherwise, the entire RICO claim could not be tried in one civil action.").

Courts in this Circuit have concluded that "[t]he phrase 'transacts his or her affairs' contained in § 1965(a) 'has been held to be synonymous with the "transacts business" language of section 12 of the Clayton Act' and '[t]he test for transacting business for venue purposes under the antitrust laws is co-extensive with the test for jurisdiction under New York CPLR § 302.'" *Arabi* v. *Javaherian*, No. 13 Civ. 456 (ERK) (CLP), 2014 WL 3892098, at *8 (E.D.N.Y. May 1, 2014) (quoting *City of New York* v. *Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 542 (S.D.N.Y. 2005)). Given the conduct alleged in the Amended Complaint, the Court plainly has jurisdiction over Defendant Wang, a New York domiciliary who laundered the proceeds of the fraud in the New York real estate market. What is more, given the nature of the scheme alleged and the many ties it has to New York, the ends of justice are best served by this Court exercising jurisdiction over Defendant Mangan.

### b. Specific Jurisdiction under N.Y. C.P.L.R. § 302

While Plaintiff's focus is on personal jurisdiction under RICO, it asserts (obliquely, at times) jurisdiction under New York's long-arm statute. (*See* Def. Opp. 23 & n.3 (claiming personal jurisdiction based on conduct undertaken in New York, including receipt of funds relating to alleged expense account fraud)). And, contrary to her arguments, Defendant Mangan is also subject to specific jurisdiction under that statute. (*See* Def. Br. 9). To review, a

13

defendant is subject to jurisdiction in a forum state if that state's long-arm statute so authorizes. *AmTrust*, 2017 WL 728262, at *6. Under New York's Civil Practice Law and Rules, a court may exercise personal jurisdiction over a non-domiciliary defendant who, either "in person or through an agent … transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1); *cf. id.* § 301 (discussing general jurisdiction)

A defendant transacts business within a state if she has "purposefully availed [her]self of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *United States* v. *Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 76 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Reich* v. *Lopez*, 38 F. Supp. 3d 436, 457 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017)). Whether a defendant has "purposefully availed [her]self of the New York forum is a fact-intensive inquiry" that requires the trial court to "closely examine the defendant's contacts for their quality." *Licci*, 732 F.3d at 168 (internal quotation marks and citation omitted). And under New York law, a defendant who purchases property within the state is considered to have purposefully availed herself of conducting activities therein. *See Prevezon*, 122 F. Supp. 3d at 77 (finding that the Court could properly exercise personal jurisdiction over defendants who "actively invested funds into the purchase of real estate" in the district where the court was located).

Mangan's real estate purchase in December 2013 satisfies the low threshold requirement under N.Y. C.P.L.R. § 302(a)(1). Indeed, this Court has a statutory basis for exercising personal jurisdiction over Mangan because she "us[ed] funds that were a result of the schemes and unlawful activities" to purchase the condominium in Flushing, New York. (Am. Compl. ¶ 10). Just as the court in *Prevezon* exercised personal jurisdiction over a non-domiciliary who purchased New York properties with fraudulent funds, so too can this Court exercise personal jurisdiction over a non-domiciliary who knowingly invested misappropriated funds into New York real estate. (*Id.* at ¶¶ 27, 46). Put simply, Mangan purposefully availed herself of the privilege of conducting activities in New York because she used "laundered funds derived from the illegal activities to make the purchase" in the state. (*Id.* at ¶ 103). *See also Elsevier I*, 77 F. Supp. 3d at 344 (concluding that the "[p]roof of one transaction in New York is sufficient to invoke jurisdiction ... so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." (quoting *Chloé* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010))).[3]

---

[3]   Mangan is also arguably subject to jurisdiction under subsection 302(a)(2), which provides that "a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act." N.Y. C.P.L.R. § 302(a)(2). Plaintiff alleges, among other things, that Mangan received the proceeds of an expense account scheme perpetrated by Hu in her New York bank account (*see* Am. Compl. ¶¶ 10, 70-74), and contends that Mangan committed the torts of aiding and abetting a breach of fiduciary duty and conversion. However, a "defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999); *see also Twine* v. *Levy*, 746 F. Supp. 1202, 1206 (E.D.N.Y. 1990) ("This [physical presence requirement] is tantamount to requiring the physical presence of the defendant or his

### c. Due Process Considerations[4]

Mangan argues that the exercise of jurisdiction would violate due process because she does not "have minimum contacts with the State of New York," and it is "not fair or reasonable for [her] to have to defend herself" in a court outside her district of residency. (Mangan Decl. ¶¶ 4-5). Again, the Court disagrees. Exercising jurisdiction over Mangan would not violate due process because Mangan allegedly committed her fraudulent conduct in New York, thereby purposefully directing herself to the state. *See Elsevier I*, 77 F. Supp. 3d at 347.

A court determines whether it has a constitutional basis for exercising personal jurisdiction first, by analyzing "whether the defendant has sufficient minimum contacts with the forum (the 'minimum contacts' [inquiry]) ... and, if so, second, whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' (the 'reasonableness inquiry)." *AmTrust*, 2017 WL 728262, at *7 (citing *Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996)).

A defendant satisfies the "minimum contacts" inquiry by making sufficient contacts with the forum state. *Daimler*, 134 S. Ct. at 765. In turn, a defendant makes sufficient contacts by "purposefully availing [her]self of the

---

agent within the state when the tort occurs."). It is not clear to the Court that Plaintiff's pleading satisfies this requirement.

[4] Because this section responds to Defendant Mangan's arguments, it focuses, as she did, on the due process issues occasioned by the use of the New York long-arm statute. The analysis is equally transferable to a due process inquiry under 18 U.S.C. § 1965(b).

privilege of conducting activities within the forum State ... thereby invoking the benefits and protections of its laws." *Licci ex rel. Licci* v. *Lebanese Can. Bank*, 673 F.3d 50, 61 (2d Cir. 2012) (internal quotation marks and citation omitted). If the defendant satisfies the "minimum contacts" requirement, courts consider those contacts in light of five factors (known as the "*Asahi* factors") to determine whether the exercise of personal jurisdiction is reasonable:

> [i] [T]he burden that the exercise of jurisdiction will impose on the defendant; [ii] the interests of the forum state in adjudicating the case; [iii] the plaintiff's interest in obtaining convenient and effective relief; [iv] the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and [v] the shared interest of the states in furthering substantive social policies.

*Chloé*, 616 F.3d at 164 (citing *Asahi Metal Indus. Co.* v. *Super. Ct. Cal., Solano Cty.*, 480 U.S. 102, 113 (1987)).

Here, Plaintiff has already alleged that Mangan satisfies the minimum contacts inquiry under the "transacting business" prong of New York's long-arm statute because she used misappropriated funds to purchase property in Flushing. (Am. Compl. ¶ 103). Plaintiff further alleges that Mangan had sufficient contact with New York because she made banking trips to New York, "held a valid New York driver's license," registered a Mercedes-Benz in New York from September 2011 to September 2013, and listed an address in Little Neck, New York, on the deed of her Flushing property. (Pl. Opp. 24). *Cf. Reich*, 38 F. Supp. 3d at 456 (observing, in context of determining defendant's domicile for general jurisdiction purposes, that a court might be able to

exercise personal jurisdiction over a defendant who held "a New York State driver's license, maintain[ed] ... checking and credit card accounts at New York banks ... and list[ed] on tax returns New York as his home address" (internal quotation marks and citation omitted)).

Plaintiff has also demonstrated that the exercise of personal jurisdiction over Mangan is reasonable by alleging that Mangan acted in New York to further Hu's RICO scheme, including by her involvement in the purchase of real estate with the proceeds of the price-inflation fraud and the use of her bank account to receive proceeds from the expense-account fraud. And while Plaintiff does not robustly argue that personal jurisdiction is reasonable, the Court nevertheless finds that the *Asahi* factors weigh in its favor. *See Elsevier I,* 77 F. Supp. 3d at 347-48. This Court finds the first factor, the burden imposed on Mangan having to litigate the action in New York, to be effectively "incapable of tilting the scales given modern advances" in technology. *Id.* at 348. Indeed, Mangan's argument that litigating "more than 2[,]800 miles from her home" is unfair (*see* Def. Br. 9) has "weak support, if any, because [of] the conveniences of modern communication and transportation." *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002).

The second factor also favors Plaintiff. Even though Plaintiff is not a resident of New York, a district court in the state may still have a "manifest interest in providing effective means of redress." *Chloé*, 616 F.3d at 173 (internal quotation marks omitted) (quoting *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 483 (1985)). Given RICO's goal of eradicating organized crime

nationwide, New York certainly has an interest in regulating potentially criminal business transactions occurring within its borders.

The third factor also weighs in favor of Plaintiff, who would be better able to litigate the case against Defendant Mangan in this District "because some of its witnesses and other evidence are presumably located here." *Elsevier I*, 77 F. Supp. 3d at 348. Indeed, evidence pertaining to Mangan's involvement in the scheme is largely limited to New York, where she allegedly "shelter[ed] illicit funds" and bought real estate. (Am. Compl. ¶ 104). The fourth and fifth factors "appear to be neutral." *Elsevier I*, 77 F. Supp. 3d at 348 (citing *Chloé*, 616 F.3d at 173).

All told, it is both statutorily and constitutionally appropriate for this Court to exercise personal jurisdiction over Defendant Mangan. Her motion under Rule 12(b)(2) is thus denied.

## B.    Plaintiff Has Failed to Plead a Claim Under RICO

The Court's resolution of the personal jurisdiction challenges is only half of the inquiry. Both Defendants contest the adequacy of Plaintiff's RICO pleadings, in particular, Plaintiff's attempt to satisfy RICO's requirement of a showing of domestic injury. As set forth in the remainder of this section, these arguments have considerable traction.

### 1.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

A complaint survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 554, 570 (2007)).

A claim is plausible on its face "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.*

The heightened pleading standard specified in *Twombly* "require[s]

enough facts to nudge [the plaintiff's] claims across the line from conceivable to

plausible." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per

curiam) (citing *Twombly*, 550 U.S. at 570).  While a court should accept

plaintiff's allegations from the complaint as true, it need not follow that course

for any of plaintiff's legal conclusions.  *See Iqbal*, 556 U.S. at 678.  Legal

conclusions that are stated to support "[t]hreadbare recitals of the elements of

a cause of action ... do not suffice." *Id.*  Therefore, a court is entitled to dismiss

a complaint under Rule 12(b)(6) if the plaintiff merely offers "labels and

conclusions or a formulaic recitation of the elements of a cause of action." *Am.*

*Fed'n of State, Cty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan* v. *Bristol-*

*Myers Squibb Co.* ("*37 Health & Sec. Plan*"), 948 F. Supp. 2d 338, 344 (S.D.N.Y.

2013) (citing *Iqbal*, 556 U.S. at 678).

### 2.    **Pleading a Private Action Under RICO**

Congress enacted RICO in 1970 to "eradicat[e] ... organized crime in the

United States." *37 Health & Sec. Plan*, 948 F. Supp. 2d at 344 (citing Pub. L.

No. 91-452 (1970)).  Under RICO, organized crime is defined as racketeering

activity, a term that "encompass[es] dozens of state and federal statutes" that

serve as punishable predicate acts.  *RJR Nabisco, Inc.* v. *European Cmty.*, 136

S. Ct. 2090, 2096 (2016).  An individual who commits two or more predicate acts within a ten-year period violates RICO so long as "those predicate offenses are related to one another ... and the predicates amount to or pose a threat of continued criminal activity."  *Elsevier, Inc.* v. *Grossmann*, No. 12 Civ. 5121 (KPF), 2017 WL 1843298, at *3 (S.D.N.Y. May 8, 2017) ("*Elsevier III*") (internal quotation marks omitted) (citing *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

The instant case concerns 18 U.S.C. § 1962(c) and (d), which generally prohibit a defendant who is part of a larger enterprise from engaging in, or conspiring to engage in, a "pattern of racketeering activity."  18 U.S.C. § 1962(c).[5]  Section 1962(c) makes it "unlawful for [i] any person employed by or associated with [ii] any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a [iii] pattern of [iv] racketeering activity."  *Id.*  Section 1962(d) applies the same prohibitions to a defendant who conspires to violate subsection (c).

Of particular significance here, RICO affords a private right of action to individuals who are harmed by racketeering activity.  *See* 18 U.S.C. § 1964. This private right of action allows a plaintiff to bring a claim under RICO for sustaining injuries "in [its] business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  A plaintiff who proves injuries in its

---

[5]     While Defendants are correct that only Defendant Hu is charged with a violation of 18 U.S.C. § 1962(c) (*see* Def. Reply 7), both of them are charged with conspiracy to commit RICO under 18 U.S.C. § 1962(d), which is analytically dependent on subsection (c).

business or property may "recover threefold the damages [it] sustains and the cost of the suit, including a reasonable attorney's fee[.]" *Id.*

### 3. Summary of the Parties' Arguments

The viability of Plaintiff's civil RICO claim depends on the adequacy with which it has alleged a "domestic injury," a concept discussed extensively in this Opinion and disputed vigorously by the parties in their submissions. Plaintiff sources its claim of domestic injury by cataloging: (i) the damage to its reputation in the U.S. soybean market; (ii) its strong business connection to the U.S., including during the period of the alleged fraud; (iii) the losses it incurred over the life of the fraud, both early (in the form of overpayment and increased soybean costs) and late (in the form of reduced production and layoffs); and (iv) the costs incurred by Plaintiff in investigating and litigating Defendants' fraudulent conduct.

Defendants counter that, even if true, damage to Plaintiff's "business profits and business equity interest, to its reputation and goodwill, and exposure to lawsuits and claims, and impairment of its interest in executed contracts and agreements are not domestic injuries." (Def. Br. 7). Put somewhat differently, even if Plaintiff suffered from losing its soybean supplier in the United States, it felt the effects of that loss only in China, its country of incorporation and principal place of business. (*Id.* at 2). Further, Defendants argue that damage to Plaintiff's reputation is considered a "personal injury and ... not an injury to business or property within the meaning of 18 U.S.C.

§ 1964(c)." (*Id.* at 7 (quoting *Hamm* v. *Rhone-Poulenc Rorer Pharms., Inc.*, 187

F.3d 941, 954 (8th Cir. 1999))).[6]

### 4.    Analysis of Plaintiff's Civil RICO Claim

### a.    Defining "Domestic Injury"

Particularly after the Supreme Court's decision in *RJR Nabisco*, putative

RICO violations are construed narrowly to adhere to the well-established

presumption against extraterritoriality.  *RJR Nabisco*, 136 S. Ct. at 2108.  This

presumption holds that "federal laws will be construed to only have domestic

application."  *Id.* at 2100.  As relevant here, the Court in *RJR Nabisco* held that

a private cause of action under 18 U.S.C. § 1962 requires a plaintiff to prove —

with attention to both the elements specified above and the extraterritoriality

limitations on certain predicate acts — a domestic injury to the plaintiff's

business or property.  *Id.* at 2111; *cf. City of Almaty, Kazakhstan* v. *Ablyazov*,

---

[6]    An open issue in this case concerns whether reputational harm is a cognizable injury under RICO.  Defendants offer various cases for the proposition that it is not.  (*See* Def. Br. 7-8 (citing, *inter alia*, *Hamm* v. *Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) ("Damage to reputation is generally considered personal injury and thus is not an injury to business or property' within the meaning of 18 U.S.C. § 1964(c)." (internal quotation marks and citation omitted)); *Kerik* v. *Tacopina*, 64 F. Supp. 3d 542, 561 (S.D.N.Y. 2014) (finding that reputational harm cannot solely support a RICO cause of action when the facts alleged made it difficult to discern whether the plaintiff's reputation was directly harmed as a result of any alleged RICO scheme rather than "other factors")).  But no case law specifically matches the facts alleged in the Amended Complaint, where Plaintiffs explicitly tie the reputational harm to Defendants' conduct. *Compare* Am. Compl. ¶ 114 ("For example, a representative of [P]laintiff was told by a supplier of soybeans that [P]laintiff did not honor contracts and had trouble because of Gary Hu, thus injuring [P]laintiff's reputation in the United States."), *with Kimm* v. *Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) (summary order) ("As written, the generalized reputational harms alleged, including the risk of future lost business commissions, are too speculative to constitute an injury to business or property.").  While the issue is far from clear, for the purposes of this Opinion, the Court assumes that reputational harm, at least in the highly particularized form alleged by Plaintiff, is cognizable under RICO.

226 F. Supp. 3d 272, 281 (S.D.N.Y. 2016) ("*RJR Nabisco* makes clear that 'domestic injury to business or property' is an independent requirement for bringing a private RICO action — separate and apart from the requirement of a substantive RICO violation that is either domestic or permissibly extraterritorial[.]"), *motion to certify appeal denied*, No. 15 Civ. 5345 (AJN), 2017 WL 1424326 (S.D.N.Y. Apr. 20, 2017).

The Supreme Court left open the question of determining what constitutes a domestic injury, and federal district courts "have diverged in their analysis thereof." *Elsevier III*, 2017 WL 1843298, at *4. In general, courts have adopted one of two lines of reasoning: "[t]he first line ... focuses on where the alleged injury was suffered. The second line ... focuses on where the conduct occurred that caused the injury." *Id.* (citing *Cevdet Aksüt Oğullari Koll. Sti* v. *Cavusoglu*, Civ. No. 2:14-3362, 2017 WL 1157862, at *4 (D.N.J. Mar. 28, 2017)).

In an earlier case, this Court reviewed both lines of reasoning and adopted the former, locus-of-effects approach. *See Elsevier, Inc.* v. *Grossman*, 199 F. Supp. 3d 768, 781-92 (S.D.N.Y. 2016) ("*Elsevier II*"), *order clarified sub nom. Elsevier Inc.* v. *Grossmann*, No. 12 Civ. 5121 (KPF), 2016 WL 7077037 (S.D.N.Y. Dec. 2, 2016). This approach determines the existence of a domestic injury by focusing on where the plaintiff felt the effects of the injury, and not where the defendant committed the injury-inducing acts. A two-step analysis determines where a plaintiff suffered an injury. First, the Court determines "what type of injury a RICO plaintiff has suffered." *Id.* at 786. Second, if the

24

plaintiff has suffered an injury to its business, then the Court asks "where substantial negative business consequences occurred." *Id.*

Other courts in this District have similarly concluded that a domestic injury is determined with reference to where the plaintiff feels the extent of the harm. *See, e.g., Bascuñan* v. *Daniel Yarur ELS Amended Complaint A*, No. 15 Civ. 2009 (GBD), 2016 WL 5475998, at *4 (S.D.N.Y. Sept. 28, 2016) (observing that when determining "where an economic injury accrued, courts typically ask two common-sense questions: [1] who became poorer, and [2] where did they become poorer.' ... This inquiry usually focuses upon where the economic impact of the injury was ultimately felt.'" (internal citations omitted)). These courts have generally found that a domestic injury to a plaintiff's business accrues "where the loss is suffered, which in the fraud context, is where the economic impact is felt, normally the plaintiff's residence." *City of Almaty*, 226 F. Supp. 3d at 282 (internal quotation marks omitted) (citing *Gorlin* v. *Bond Richman & Co.*, 706 F. Supp. 236 (S.D.N.Y. 1989)).

Judge Nathan's analysis in *Almaty* is useful. The plaintiff, a city in Kazakhstan, alleged that a former mayor and his family stole city funds in excess of $300 million and invested those funds in New York City real estate projects. *City of Almaty*, 226 F. Supp. 3d at 275. The court held that even though the mayor and his co-conspirators used the funds in the United States, the plaintiff city did not suffer a domestic injury. *Id.* at 284. In other words, because the plaintiff suffered economic harm to its business, the place of injury was "the state of plaintiff's residence, and foreign corporations are recognized

to reside either in their principal place of business or their place of incorporation." *Id.* at 282 (quoting *Deutsche Zentral-Genossenchaftbanks AG* v. *HSBC N. Am. Holdings, Inc.*, No. 12 Civ. 4025 (AT), 2013 WL 6667601, at *5 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks and citation omitted)); *see also Elsevier II*, 199 F. Supp. 3d at 786 ("If the plaintiff has suffered an injury to his or her business, the court should ask where substantial negative business consequences occurred. By contrast, if the plaintiff has suffered an injury to his or her property, the court should ask where the plaintiff parted with the property or where the property was damaged.").

### b. Plaintiff Has Failed to Allege a Domestic Injury to Its Business

Recognizing the challenges occasioned by this Court's prior adoption of a locus-of-effects test, Plaintiff charts a difficult course, asking the Court, first, to foreswear its earlier decision and, second, to fit Plaintiff's allegations within the Court's earlier decision. The Court can do neither.

First, Plaintiff contends that the price-inflation scheme in which Defendants participated caused domestic injury by substantially damaging Plaintiff's reputation in the United States soybean market. (Pl. Opp. 9-10). Noting the disagreements among lower courts, Plaintiff champions the view that the "domestic injury" requirement is satisfied so long as "the actions causing the injury took place primarily in the United States." (*Id.* at 12). Here, Plaintiff notes, the allegedly fraudulent acts primarily took place in the United States; the participants involved in Defendant Hu's scheme were domiciled and employed in the United States; the soybeans were grown and bought in the

United States; and Defendants garnered many of their illicit profits in the United States.  (*Id.*; *see also id.* at 15-16; Am. Compl. ¶ 112).

Plaintiff's argument depends largely, if not exclusively, on a non-precedential decision from outside of this Circuit, *Tatung Co.* v. *Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1155 (C.D. Cal. 2016).  In *Tatung*, the court found a domestic injury where the defendants, several co-conspiring companies, "specifically targeted their conduct at California with the aim of" siphoning funds from Plaintiff, a foreign corporation.  *Id.* at 1156.  *Tatung* squarely rejected the view that a domestic injury occurs only where a foreign corporation feels the effects wrongful conduct.  *Id.*  By the *Tatung* court's reckoning, such an approach would "amount[] to immunity for U.S. corporations who, acting entirely in the United States, violate civil RICO at the expense of foreign corporations doing business in the country."  *Id.*[7]

Plaintiff's argument is severely undermined by the fact that courts in this District have repeatedly and expressly rejected the legal underpinnings of the *Tatung* decision.  Notably, *Tatung* declined to follow *Bascuñan* after determining that a domestic injury occurs where the defendant directs his fraudulent acts.  *See Tatung*, 217 F. Supp. 3d at 1154.  But this Court

---

[7]    Judge Nathan, in the *Almaty* decision, "share[d] the *Tatung* court's hesitation to broadly endorse an absolutist version of the [domestic injury] rule that would, for example, categorically preclude foreign corporations with business operations or property interests maintained in the U.S. from bringing RICO actions to recover for injuries to those assets."  *City of Almaty, Kazakhstan* v. *Ablyazov*, 226 F. Supp. 3d 272, 284 (S.D.N.Y. 2016), *motion to certify appeal denied*, No. 15 Civ. 5345 (AJN), 2017 WL 1424326 (S.D.N.Y. Apr. 20, 2017).  This Court finds that the facts of this case, as did the facts in *Almaty*, "present[] no such circumstances."  *Id.*

explicitly adopted the approach described in *Bascuñan*, which defined a domestic injury to occur "where the plaintiff suffered the injury, not at all where the defendant's alleged conduct took place." *Id.*; *see also Elsevier III*, 2017 WL 1843298, at *5. Having already concluded that a domestic injury occurs where a RICO plaintiff suffers an alleged injury, this Court will not now accept Plaintiff's argument for the contrary position. *See, e.g.*, *Elsevier III*, 2017 WL 1843298, at *5 (internal citation omitted).

Perhaps anticipating the Court's reaction, Plaintiff changes tack, arguing that its facts are consistent with those of the Court's prior decision in *Elsevier*, where it found that a plaintiff suffers a domestic injury if the fraud alleged "had some effect on ... relationships with actual or prospective [United States] customers." (Pl. Opp. 12-13 (quoting *Elsevier II*, 199 F. Supp. 3d at 788)). In particular, Plaintiff argues that the Amended Complaint "sets forth that precise claim, substituting 'suppliers' for 'customers'[.]" (*Id.* at 13). Defendants' scheme damaged Plaintiff's relationship with United States soybean suppliers, causing harm to its "business reputation within the insular soybean community." (*Id.* at 13-14). To make this argument, however, Plaintiff unnaturally parses the Court's opinion. The two cases are not analogous, and substituting the word "suppliers" for "customers" dramatically alters the domestic injury analysis.

In *Elsevier*, a broker of scientific publications obtained from the publisher-plaintiff subscriptions to printed journals that it then illegally resold and shipped from the United States to institutions in Brazil. *Elsevier III*, 2017

WL 1843298, at *1.  In considering the domestic injury element, the Court focused on where the plaintiff had been deprived of money or property.  It found that the plaintiff had sufficiently alleged a domestic injury by asserting that nearly all of the subscriptions at issue had been shipped from within the United States — and thus, that the plaintiff had been deprived of its property (i.e., the scientific journals) in the United States.  *Id.* at *6.

Here, by contrast, Plaintiff seeks to find a domestic injury with regard to soybean contracts that shipped the commodity outside the United States.  (Pl. Opp. 11-12).  Any deprivation of Plaintiff's money was felt in China.  And, in sharp contrast to *Elsevier*, Plaintiff was not deprived of its property in the United States; indeed, Plaintiff received all of the soybeans for which it contracted with U.S. suppliers.  And while Defendants' conduct may have impaired Plaintiff's later ability to secure soybean suppliers in the United States, such a loss of potential business opportunities is not a cognizable domestic injury.  In other words, Plaintiff's expectation of continued contract counterparties among U.S. soybean suppliers is far too attenuated to suffice as a domestic injury under RICO.

Plaintiff's third and fourth arguments adopt similar lines of reasoning, and fail for similar reasons.  Plaintiff argues that its reputational injury among United States suppliers is recoverable under RICO because "it result[ed] in 'concrete economic, contractual or business losses.'"  (Pl. Opp. 14 (quoting *Cement-Lock* v. *Gas Tech Inst.*, No. 05 C 0018, 2017 WL 4246888, at *26 (N.D. Ill. Nov. 29, 2007)) (internal citation omitted)).  In the early stages of the

scheme, Defendants' price manipulation caused Plaintiff specific monetary losses in the form of overpayment on each soybean contract and increased costs associated with letters of credit, interest, and insurance. (*Id.*). At the conclusion of the scheme, the damage to Plaintiff's reputation caused by the fraud led to "Dandong's processing plant closing for a month and operating at a substantially reduced capacity." (*Id.*).

Plaintiff also argues that Defendants' allegedly wrongful conduct caused damage by requiring Plaintiff to investigate and litigate the present case in the United States. (Pl. Opp. 17). While 18 U.S.C. § 1964 already allows for recovery of attorneys' fees, Plaintiff argues that the legal fees it expended to uncover Defendants' wrongful conduct "constitute[] another domestic injury compensable to Dandong under RICO." (*Id.* (citing *Chevron Corp.* v. *Donziger*, 833 F.3d 74, 135 (2d Cir. 2016) (internal citation omitted) (finding that legal fees constitute recoverable damages under RICO "when they are proximately caused by a RICO violation"))).[8] In Plaintiff's estimation, Defendants caused further damage to its business by concealing their conspiracy and forcing Plaintiff to expend significant resources to uncover the RICO scheme. (*Id.*).

The Court cannot accept either of these arguments. Monetary losses and attorney fees are not "domestic" simply because the alleged conduct that produced them occurred in the United States. Defendants may have engaged

---

[8]    The Court notes that neither Judge Kaplan nor the Second Circuit addressed the contours of the domestic injury element in their respective *Donziger* decisions.

in fraudulent conduct within the United States, but "it does not follow that [Plaintiff was] injured" there. *Elsevier II*, 199 F. Supp. 3d at 788. Similarly, a foreign corporation cannot allege a domestic injury to its business if it only experiences the effects of an alleged RICO scheme abroad. *Cevdet*, 2017 WL 1157862, at *6.

In *Cevdet*, a Turkish food supplier brought a civil RICO claim against a food importer for allegedly inducing the supplier to send its products from Turkey and converting them as they came into the United States. 2017 WL 1157862, at *6. The district court rejected the reasoning in *Tatung* in favor of *Elsevier*, agreeing with this Court that the "more persuasive" domestic injury test looks to where the plaintiff suffered the injury, not where the RICO predicate acts occurred. *Id.* at *7. The *Cevdet* court found that the Turkish food supplier could not allege a domestic injury because "its business is entirely located in and operated out of Turkey." *Id.* Since the supplier only felt the ramifications of the fraud at its business abroad, it could not allege that it suffered any injury within the United States. *Id.*; *see also Exeed Indus., LLC* v. *Younis*, No. 15 C 14, 2016 WL 6599949, at *3 (N.D. Ill. Nov. 8, 2016) (finding that an industrial material supplier did not suffer a domestic injury because "the initial injury that impacted Plaintiffs" occurred in the United Arab Emirates "where [its] business and economic operations [were] centered").

Like the Turkish food supplier in *Cevdet*, which only felt the harmful effects of the food importer's conversion scheme at its Turkish home base, Plaintiff here only felt the effects of Defendants' overpricing scheme in China.

After Defendants allegedly overpriced the soybean contracts and siphoned the excess funds, Plaintiff terminated ninety employees and reduced its soybean production in its Dandong City factory. (Am. Compl. ¶¶ 121-22). And while Plaintiff did incur attorneys' fees in the United States, those expenses were paid from China. (*Id.* at ¶ 122). Regardless of where the conspirators' conduct took place, Plaintiff's injury was felt in China, the only place its business had ever been located. In short, the Amended Complaint fails to plead domestic injury, and thus fails to state a claim under 18 U.S.C. § 1962(c).

Finally, a word is in order about comity. The *RJR Nabisco* Court premised its decision in substantial part on the risks of "international friction" associated with allowing foreign entities to "bypass" potentially "less generous remedial schemes" available in their home jurisdictions and pursue treble damages for injuries suffered abroad through civil RICO actions in the United States. 136 S. Ct. at 2106-07 (internal quotation marks omitted). Plaintiff here seeks treble damages for lost profits and associated costs stemming from the Hu price-inflation fraud — notwithstanding the fact that the Chinese government has prosecuted Gary Hu and sentenced him to twenty years' imprisonment for his role in this very fraud. The Court is concerned about issuing a decision finding a viable private civil RICO claim on these facts: "Allowing [Plaintiff's] RICO claims to proceed under these circumstances would be at odds with the Supreme Court's directive that the need to enforce the presumption against extraterritoriality is 'at its apex' when remedies available

in United States courts may conflict with those available abroad." *City of Almaty*, 226 F. Supp. 3d at 288 (citing *RJR Nabisco*, 136 S. Ct. at 2107).

### 5. Plaintiff's Civil RICO Conspiracy Claim Thus Fails

The failure of Plaintiff's claim under § 1962(c) has ripple effects on its conspiracy claim under § 1962(d), the one federal claim alleged against Defendants. To state a cause of action under the latter provision, a plaintiff must allege facts demonstrating an intent to further "an endeavor which, if completed, would satisfy all of the elements" of the substantive offense under 18 U.S.C. § 1962(c). *Ritchie* v. *N. Leasing Sys., Inc.*, No. 12 Civ. 4992 (KBF), 2016 WL 1241531, at *8 (S.D.N.Y. Mar. 28, 2016) (quoting *Baisch* v. *Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003)). But a RICO conspiracy claim "necessarily must fail if the substantive claims are themselves deficient." *New York* v. *United Parcel Serv., Inc.*, No. 15 Civ. 1136 (KBF), 2016 WL 4203547, at *4 (S.D.N.Y. Aug. 9, 2016) (internal quotation marks and citation omitted). Plaintiff did not sufficiently prove that it suffered a domestic injury from the alleged price-inflation scheme; in consequence, the claims under 18 U.S.C. § 1962(d) against each Defendant must be dismissed.

### C. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's State-Law Claims

In addition to its civil RICO conspiracy claim, Plaintiff alleges state-law claims against Defendants for aiding and abetting breach of fiduciary duty and

conversion.  (Am. Compl. ¶ 3).[9]  Defendants Wang and Mangan move to dismiss these claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  (Def. Br. 19-20).

A court retains discretion to exercise supplemental jurisdiction over state-law claims even when it has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  However, because the Second Circuit "counsels *against* exercising supplemental jurisdiction in such a situation," this Court will decline to exercise supplemental jurisdiction over Plaintiff's state-law claims, and will dismiss them without prejudice to their refiling in state court.  *Jus Punjabi, LLC* v. *Get Punjabi Inc.*, No. 14 Civ. 3318 (GHW), 2015 WL 2400182, at *12 (S.D.N.Y. 2015) (quoting *First Capital Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004)) (emphasis in *Jus Punjabi*); *see generally Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013).

## CONCLUSION

The motion of Defendants Wang and Mangan to dismiss the Amended Complaint as to each is GRANTED; the Court dismisses the RICO conspiracy claim with prejudice and the state-law claims without prejudice.  The Clerk of Court is directed to terminate the motion at docket entry 78.  Plaintiff is further

---

[9]    The Amended Complaint also alleges a claim for civil conspiracy, but Plaintiff has indicated its intent to dismiss this count.  (Def. Opp. 28).

ORDERED to submit a letter to the Court on or before August 18, 2017, outlining the status of the case as to Defendant Gary Hu.

SO ORDERED.

Dated:     August 3, 2017
              New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge